FILED

2012 FEB 14  PM 4: 10

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

William J. Wall – State Bar No. 203970
**THE WALL LAW OFFICE**
**A PROFESSIONAL CORPORATION**
9900 Research Drive
Irvine, CA 92618
Telephone: (949) 387-4300
Facsimile: (800) 722-8196
wwall@wall-law.com

*Attorneys for Plaintiff*
*Aura Catalan*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

AURA CATALAN

              Plaintiff,

       vs.

EXPERIAN INFORMATION
SOLUTIONS, INC.

           Defendant.

Civil Action No. SACV12-00253 RNB
_____

**COMPLAINT FOR VIOLATIONS OF**
**FAIR CREDIT REPORTING ACT**

**DEMAND FOR JURY TRIAL**

Plaintiff Aura Catalan ("Plaintiff") alleges as follows:

I.

### PRELIMINARY STATEMENT

1.    Defendant Experian Information Solutions, Inc. ("Defendant") a national consumer reporting agency ("CRA"), has been selling credit reports inaccurate marking Plaintiff as deceased. When it inaccurately reports a living consumer as deceased, Defendant makes it practically impossible for that consumer to access credit, as it did with Ms. Catalan. Defendant's practices also

1

harm the businesses that purchase its reports; as such companies cannot process credit applications due to the applicant's lack of a credit score. There is no good faith rationale to explain Defendant's practices other than the generation of revenue. If Defendant actually believed that Ms. Catalan was deceased, it had no legally permissible basis to sell her report. If Defendant believed Ms. Catalan was alive, it knowingly sold her report with a gross inaccuracy. Moreover, Defendant knows that identity thieves use the credit information of truly deceased persons to commit credit fraud. Defendant thus violated Plaintiff's rights under the Fair Credit Reporting Act (FCRA), as set forth below.

## II.

### JURISDICTION AND VENUE

2.    Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3.    Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## III.

### PARTIES

4.    Plaintiff Aura Catalan is an adult individual who resides at 5570 La Sierra Avenue, Riverside, CA 92505.

5.    Defendant Experian Information Solutions, Inc. ("Experian") is a business entity and consumer reporting agency that regularly conducts business in the State of California and this District, and which has its headquarters and a principal place of business located at 475 Anton Boulevard, Costa Mesa, CA 92626.

## IV.

### FACTUAL ALLEGATIONS

6.    Defendant is regulated as "consumer reporting agencies under the FCRA. 15 U.S.C. § 1681a(e).

2

1    7.    Defendant sells millions of consumer reports (often called "credit
2  reports" or "reports") per day, and also sells credit scores.  15 U.S.C. § 1681a(e).
3    8.    Pursuant to the FCRA, Defendant must follow procedures which
4  assure that the reports it sell meet the standard of "maximum possible accuracy."
5  15 U.S.C. § 1681e(b).
6    9.    Pursuant to the FCRA, Defendant must maintain reasonable
7  procedures to assure that reports are only sold for legitimate "permissible
8  purposes." 15 U.S.C. §§ 1681e(a) and 1681b.
9    10.    Defendant places a "deceased" notation or marking on reports when
10 it is advised from any of its many data furnishing sources that a given consumer is
11 deceased.
12   11.    The furnishing sources identify "deceased" consumers by marking
13 the "status" of such consumer's responsibility for any subject account with an "X"
14 code in the ECOA field of an electronic data input format used in the credit
15 reporting industry, known as Metro or Metro 2.
16   12.    Defendant does not request or require a death certificate from any of
17 its data sources which advise that a consumer is "deceased" before placing a
18 "deceased" mark on that consumer's report.
19   13.    Defendant does not request or require any proof from any data source
20 which advises that a consumer is "deceased" showing that the consumer is, in fact,
21 deceased before placing a "deceased" mark on that consumer's report.
22   14.    Defendant does not independently verify with any source that a
23 consumer is, in fact, deceased before placing a "deceased" mark on that
24 consumer's report.
25   15.    A deceased notation is a very unusual marking upon a credit file or
26 credit report.
27

16. In some cases, in order to assure accuracy, Defendant sends letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in its credit files, such as in cases where consumers have a freeze or fraud alert on its credit report, or in accordance with certain state laws. But Defendant has no similar procedure to notify the consumers (such as next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendant to be placed in said consumer's credit file or report.

17. Defendant regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

18. Defendant will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

19. Indeed, Defendant employs no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

20. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

21. Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant employs no procedures which

4

assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

22. Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

23. Nevertheless, Defendant routinely sells to third parties credit reports for persons with a "deceased" mark on its reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

24. Upon Defendant's reports with a "deceased" mark sold to third parties Defendant never calculates or provides a credit score for that consumer.

25. Defendant knows that many third party credit issuers require a credit score in order to process a given credit application.

26. Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

27. Defendant knows that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

28. Defendant has been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

29. Defendant has received and documented thousands of disputes from consumers complaining that its Experian credit report had them erroneously marked as "deceased."

30. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their Experian credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

31.    Nevertheless, Defendant employs no procedures which assure that a consumer marked as "deceased" on one of Defendant's reports is, in fact, deceased.

32.    Even consumers who dispute the erroneous "deceased" status on their Experian credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

33.    Defendant has no independent procedures to limit or stop the furnishing of reports to third parties for consumers whom it has marked as "deceased" under any circumstances.

34.    Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers whom it have marked as "deceased" under any circumstances.

35.    For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

36.    Defendant will only remove a deceased consumer's file from its credit reporting database when they are no longer valuable to them – meaning that nobody is continuing to buy that report from Defendant.

37.    Defendant charges third parties a fee for reports with a mark that a consumer is deceased (reports on the deceased) as it would for any other report.

38.    Defendant profits from the sale of reports on the deceased.

39.    Defendant has in its credit reporting databases, hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

40.    Defendant knows that truly deceased consumers do not apply for credit.

6

41.   Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

42.   Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

43.   Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

44.   Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources which report a consumer as deceased or for the buyers of its reports which access the purportedly deceased consumer's information.

45.   Indeed, Defendant sells reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

46.   For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendant to ever sell its credit reports, absent a court order.

47.   Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

48.   From at least December 2011, Plaintiff was marked by Defendant as "deceased" on her Experian credit report.

49.   Plaintiff is not deceased.

50.   Defendant did not calculate or provide any credit score for or on Plaintiff, even though it sold credit reports about her to third parties marking her as "deceased."

51.   Plaintiff was declined credit for a Kohl's store card in January 2012. Among other transactions, known and unknown, Defendant sold a credit report marking Plaintiff as deceased to Kohl's when she applied for store credit through that business.

52.   As a result, Defendant made it practically impossible for Plaintiff to obtain credit, and Plaintiff was indeed turned down for the store card she sought in January 2012 as a result of her Experian credit report erroneously marking Plaintiff as deceased.   Plaintiff also suffered harm to credit reputation and emotional distress as a result of Defendant's conduct.

53.   At all times pertinent hereto, Defendant was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

54.   At all times pertinent hereto, the Defendant's conduct, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the Plaintiff's rights herein.

## V.

### FIRST CLAIM FOR RELIEF

*Violation of FCRA*

55.   Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

56.   Pursuant to section 1681n and/or section 1681o of the FCRA, Defendant is liable for violating the FCRA by engaging in the following conduct with respect to Plaintiff:

a.   failing to follow reasonable procedures to assure "maximum possible accuracy" of the reports it sold, in violation of 15 U.S.C. § 1681e(b); and

b.   failing to follow reasonable procedures to assure that reports are sold only for legitimate "permissible purposes," in violation of 15 U.S.C. §§ 1681e(a) and/or 1681b.

## VI.

### JURY TRIAL DEMAND

59.   Plaintiff demands trial by jury.

///

///

///

### VII.

#### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in her favor for:

    a.    Statutory damages of $100 to $1,000;

    b.    Actual damages;

    c.    Punitive damages;

    d.    Costs and reasonable attorney's fees; and

    e.    Such other and further relief as may be necessary, just and proper.

THE WALL LAW OFFICE, APC

Dated: February 14, 2012

William J. Wall
Attorneys for Plaintiff Aura Catalan

10